and I will call it the case number is 21 5 1 1 0 5 Trevino versus Iden and I think it's pronounced Broakley. Mr. Hilton whenever you're ready. Thank you your honor may it please the court Chris Hilton on behalf of appellants game wardens Iden and Broakley. It is Broakley. That's what we're gonna go with today I think it was transcribed as broccoli at one point. Wardens Iden and Broakley did exactly what we all hope law enforcement officers would do. They conducted an open-minded investigation and they followed the evidence where it led them. Their investigation started with complaints of deadly conduct and unauthorized commercial hunting activity but in the course of that investigation the wardens uncovered evidence of potential fraud which they summarized and then handed to prosecutors. Under the district court's ruling their failure to stop their investigation once Mr. Trevino began to complain resulted in a waiver of sovereign immunity. The district court erred for three reasons. First it incorrectly applied an exception to the independent intermediary doctrine. Second it incorrectly concluded that probable cause was not present and third the district court failed to hold Mr. Trevino to his burden under the qualified immunity problem. Am I right that the only claim pending relates to the third indictment? That's exactly where I was going to go next. The record has been through a lot and it's voluminous for the early stage of the case. All that is left is the third indictment. As I said the investigation began with an accusation of brandishing a firearm. It was really targeted at some illegal commercial hunting activity. Under the course of that investigation the game eventually uncovered evidence of potential fraud with respect to some title transfers. One for a jet ski which was the basis of the second indictment and one for a truck which the jet ski was I think at one point traded for and that is the basis of the third indictment. So we're focused on the truck indictment? Yes, Your Honor. Did the magistrate who wrote the only opinion that we're reviewing here, did the magistrate extend its taint analysis to that indictment? Yes, Your Honor. The taint analysis and the independent intermediary analysis was under, after it had ruled that only the third indictment was at issue. Where I think the magistrate judge erred was in looking at what exactly was at issue for that indictment and seeing whether any of the alleged taint based on the other facts could have translated into the third indictment. I was thinking that the independent intermediary analysis was rather summary and it was more focused on the first and indictment not the third. I think that's a fair characterization, Your Honor. The way we read the opinion is that it did discuss it in connection with all three and attempted to apply the taint analysis. Which is generally applicable but the only thing that survives is number three. That's how we read the opinion, Your Honor. Regardless, the correct analysis for the independent intermediary doctrine is that any malicious intent here was absolved. So one of my questions was going to be that if the analysis was inadequate or it didn't reach the third indictment, should we remand it for factual findings or development or anything like that? In other words, is the correct disposition here, in your instance, reverse and remand or reverse and render? Judge Wilson, we're asking for reverse and render and I think the somewhat tortured procedural history of this case shows why. We've been through, the operative higher than that given that the plaintiff was pro se for a while. At this point, the magistrate judge and the district judge have made clear their view of the case and what remains. That dovetails with your position in response to Judge Higginson's question that the analysis about independent intermediary was really in toto as opposed to an indictment by indictment. So there's nothing else to be developed. I think that's right, Your Honor. And when you look at the involvement of independent intermediaries here, there are actually not one but two independent intermediaries. You've got the prosecutor who received the prosecutor's summary from the two wardens and then you've also got the grand jury who, of course, did their own independent analysis of the evidence and decided to return an indictment. When you look at the specific facts that are required for the offense of the third indictment, none of the more salacious allegations from the complaint have anything to do with the third indictment. The third indictment is based on a fairly straightforward conclusion by the wardens when they were investigating these title issues. Again, those issues came up in the course of their original investigation. There was no, you know, there was only one investigation all throughout. And essentially what the wardens found is that they had an eyewitness tell the wardens that they thought he'd witnessed Mr. Trevino sign the application for the Texas title in the name of another, which is the offense with which he was charged. And then when they pulled the title history, it indicated that that name was not only the prior owner but the current registered owner. And that in and of itself is enough for a finding of probable cause. And that's what the prosecutor and the grand jury had to look at when they were determining. We've got some law that doesn't put as much emphasis on the prosecutor as being independent from the case agent. So I'm focused on the grand jury. But at a motion to dismiss stage, it's pretty hard for any plaintiff to know what was in the secret grand jury room. And we've wrestled a little bit. You've cited all the cases correctly. What exactly is your position? Your argument is, yes, the defendants did write a prosecution memo. That was given to the assistant district attorney. We don't really know whether it was given to the grand jury. Is that your position or is it that there's no suggestion at all that anything in that prosecution memo was exculpatory? I would suggest that, well, first of all, we don't know what exactly was said to the grand jury. It's not alleged. And despite all of the documents that are in the record, that the plaintiff himself put in the record, detailed notes or a detailed account of what happened at the grand jury is not present. With respect to the first point you raised, I would suggest that the close interrelationship between an investigator, a law enforcement officer, and a prosecutor that might occur within a county, for example, a county sheriff and a county DA, that's somewhat attenuated here based on the facts. Here we've got game wardens who are Texas Parks and Wildlife officers. They're officers on behalf of the state of Texas. They don't have, you know, the attorney general's office cannot bring these charges on behalf of their investigation. They have to work in partnership with some other prosecutor. And the memo here, which, one of the memos is in the record. I was going to ask, there are two memos, right? And one of them, the one that is in the record, as far as what the prosecutor may or may not have done to investigate what the wardens reported. There is an internal affairs report that discusses complaints related to the events giving rise to the... Internal affairs, wait a minute, from Department of Wildlife? Yes, your honor, one of them. What I'm asking is, did the district attorney, the prosecutor, get this prosecution guide, whatever it's called, we don't know what it says, it's not in the record, right? So did the prosecutor get that and then go do an independent investigation, independent check? And do we know to what degree the prosecutor was sort of an independent actor here? I don't think the record clearly reflects that, your honor. I think there is some allegation that at least Warden Iden did provide testimony or, you know, provide information to the prosecutor in some way. But the record also does clearly reflect that Mr. Trevino had, you know, had his say in front of the prosecutors who eventually returned, who eventually, you know, presented the evidence for the third indictment. He was in contact with them directly. I believe he brought bar complaints against some of them. And so to the extent that there's any suggestion that information was withheld or that the prosecutors weren't aware of something, that's simply belied by the record. If the prosecution memo were in the record and it contained something like it didn't disclose that Russell was not believable or it didn't disclose that a handwriting expert had said that's not Brissette's signature, that would be enough to at least make this a triable issue, right? That would suggest a taint if they'd withheld either of those types of evidence. I think it is certainly a closer call. I think the handwriting expert issue is not as close a call. Because what we're really talking about here is the absence of any sort of handwriting exemplar or the absence of, you know, the investigator consulting a handwriting expert. It is not and cannot be the law that any investigator, to preserve their qualified immunity, has to engage an expert to analyze all available evidence. That's never been the holding out of the case. Well, or has to engage in an investigation that, I mean, the complainant would approve of. I mean, in other words, there's some discretion about how to investigate. And again, the whole thing is not so much the investigation, but whether there was probable cause and or whether there was an independent intermediary that found there was. That's exactly right, Your Honor. And I appreciate you mentioning probable cause, because I think that goes to your other point, Judge Higginson, with respect to, let's say that the person, the eyewitness was not credible in the view of one of these game wardens. Does that omission, the analysis under the second Frank's prong, as I understand it, in looking at probable cause, would be does that omission affect whether someone could find probable cause here? And what we have is documentary evidence that, in and of itself, is sufficient to at least put it before the prosecutor and put it before the grand jury to have them make their independent determination. What we have here is the clear documentary evidence that the previously registered owner and the currently registered owner was the out-of-state person, John Persetta, John Russell, I  Yeah. And those are facts that are not only present in the record, but they're also straight out of Mr. Tromino's complaint as well. The title record was given to the grand jury? Do we know that? The title record was pulled as part of the investigation. And my understanding is that that was an attachment to the prosecutor's summary. It certainly was the case for the prosecutor's summary that we do have in the record, that all of those things were attached. And there's no specific allegation that that fact was omitted from what the wardens gave to the prosecutor and to the grand jury. With your time, would you therefore, if you were resolved in this case, stop at this first qualified immunity because of independent and intermediary? Or would you go on to no clearly established law, which is a lot murkier in my mind, 4th and 14th Amendment? Sure. Well, that's where we're going next. And our position would be that the re's two sufficient reasons to reverse and render here. One would be intermediary, which takes care of all the plaintiff's claims. Another would be the presence of probable cause based on the investigation, which is an element of all the remaining claims. And if the court finds that probable cause is present, that will defeat the malicious prosecution aspect of this, which is also part of the First Amendment retaliation. With respect to qualified immunity, the real issue that we have here is there was no thorough or really any analysis of the second qualified immunity prong. And there was certainly no attempt by the district court, either the magistrate judge or the district judge, to hold the plaintiff to his burden of demonstrating what the clearly established law was. We see that in the response brief in this case. Mr. Trevino very clearly states to support his burden that the clearly established law in this case is Vibert v. Parr. That's a Texas Court of Appeals El Paso case. Leaving aside questions of whether that is binding, I don't believe it is, or whether it is an exemplar of a consensus of authority, which I don't think plaintiff has shown, that was a civil suit for conversion. And it's about the interplay between the Texas Transportation Code and the Texas Business and Commerce Code. It does nothing to tell you, a law enforcement officer, what are the constitutional rights of someone under investigation for this type of offense, and where is the law? But when you have a body of law, it would be tricky to write that it's not clearly established. You can't facilitate the prosecution of somebody who has made a complaint against you. I'm sorry, I don't understand the question. I didn't hear the first part of the question. I'm not thinking it's difficult to find clearly established law that tells law enforcement that you cannot help initiate or facilitate a criminal prosecution of a person because the person made complaints against you. I'm yelling. You've got plenty of time. Right. You're not disputing that that's clearly established under the law? I think as a general matter, yes, that would be clearly established, but I think that does not. That's their theory. That is the theory, but that does not answer the question before the Court for two reasons, I think. The first is that the investigation started well before the first alleged protected activity. The plaintiff's timelines are lengthy. I think the first First two indictments, 100 percent. And the district court and the magistrate judge agreed with that, that that ruling's not on appeal. Even for the third indictment, though, all we see that the magistrate judge had to say about that was that it seemed that the prosecution, and the magistrate judge uses that word, the prosecution, not the investigation, was too attenuated from the initial complaint of deadly conduct. And that's wrong for two reasons. One, it's talking about the prosecution, which the game wardens, you know, they're the investigators. They're not the prosecutors. They have no authority to prosecute. So that's the first problem. The second problem is that the investigation was one investigation. All of the facts that gave rise to the third indictment arose out of the same investigation into allegedly illegal commercial hunting activity. As part of that investigation, the wardens had to subpoena Craigslist for deleted posts. They subpoenaed phone records. They talked to others who Mr. Devino had spoken with to see if he had offered allegedly illegal hunting excursions with them. And in the course of that investigation, they discovered this issue with the truck. And so it's not as if, you know, it was two strikes, let's get them the third time, and they restarted an investigation or started a new investigation. This is all one investigation. It all took place roughly contemporaneously in that mostly early July time window, or early January 2017 time window, extending, I think, through to the end of the month. So the first protected activity would have come during the investigation, but by no means was it the thing that kicked all of this off. I see my time is up and I'll... You have rebuttal time. Thank you. Mr. Cifuentes. Good afternoon, and may it please the Court. My name is Ben Cifuentes. I was appointed by Judge Bimparad to represent Mr. Trevino as plaintiff in district court. He called me and said, since I have represented him in the criminal cases, Mr. Trevino, in the criminal cases, that he thought it best that I accept the appointment, and I agreed. We appreciate that. I think the problem with the appellant's argument, and I'll begin kind of from the beginning, is the fact that he did not address, factually or legally, the fact that Iden and Broccoli judicially confessed to the retaliation. Now, that may seem like a bold assertion to you, but I will point in the record to the points where we said that the state filed a motion to increase bond on the second case that resulted in Mr. Trevino's acquittal. They filed that motion to increase bond because the ADA asserted that Mr. Trevino was engaged in protected activity. And it was cited in the motion to increase bond, and we well pled the numerous instances where Mr. Trevino engaged in protected activity before the motion to increase bond. Now, what the appellant sought when they filed this motion to increase bond was they sought to double Mr. Trevino's bond, and of course, as you well know, if he didn't make that bond, he'd be incarcerated. They sought in the alternative to have him confined to house arrest, GPS, and they effectively requested that he be silenced or gagged by the court, which was that he was to have no more contact with the Texas Parks and Wildlife Department. That, in essence, was their confession that they were tired of his complaints, tired of his open records request, wanted him to stop, and they were willing to deprive him of his liberty if he violated his right to protected speech and request for public records. The appellants don't even address that is a fact. And Judge Bimparad in his footnote 2 noted the motion to increase bond, and he cites Nieves essentially as a, which, he was relying upon how Nieves says that you can have a retaliation comes from the protected speech. But our case is more powerful than Nieves because the appellants admitted themselves in their motion to increase bond. Now, they may argue that the DA filed that motion, but if they do that, they're going to be once again at odds with are they honest with the DA. Step back a little bit for me. What we're reviewing is the district court's adoption of Judge Bimparad's report and recommendation. Yes. In that, he says, the retaliation of malicious prosecution claims that are pending, all that's before us, is as to that December 17th 3rd indictment. Because the first two indictments, the jet ski and the hunting, those incidents he found, and it's not been appealed to us, those were before the complaints against the wardens. So, I guess that's what got me into, you heard my line of questions to him, isn't the issue before us, but disagree with me if you will, the issue before us is what's the consequence of the fact that a grand jury indicted your client for the truck forgery? That brings me to that there was no probable cause, and I'll also get into the taint involved. But do you accept the way I've characterized what's before us? Yes, to the extent that I would not say that the second and third indictment are inconsequential to this case. The first and the second. The first and the second, to this case, for the simple reason, and I will probably file a 26J letter, because I believe Judge Hickinson, you wrote an opinion on the Waco shootout. I'm sorry? The Wilson? The Wilson was cited in one of the other briefs. You don't need to 28J that. Okay. But the point of the Wilson case is that if you have the fill in the blank affidavits, and there's no distinction in probable cause, that you can look at the context of did they withhold information from the perspective of Franks v. Delaware? What we pled in terms of the first and second indictment, and also the third, is that we have a Franks v. Delaware situation with the same target, Mr. Trevino. What we pled is that, and I don't know if I quoted the right word, but the same charges were filed against Mr. Trevino. They shopped it around with the county attorney. The county attorney rejected everything. And had the district attorney in the 87th looked at this correctly, they would have realized that the first indictment was solely within the jurisdiction of the county attorney. So what we're saying is that Iden has a pattern of withholding facts, withholding the truth. Okay. And that is what was discussed in Macklin and Buehler and Wilson? Yes. This is your burden to show with substantiating facts that something was withheld as to the truck forgery? Correct. Okay. And what was it that these two defendants withheld from the grand jury that found probable cause as to the truck forgery? Well, one of the things that we don't know whether the prosecution, the second prosecution guide, it's not in the record, but I've seen it. The second prosecution guide was on the white truck alone. And what was said there was that Mr. Bissett was the owner on October 26, 2016. That's a false statement. And the importance of VBIRT and the reason they failed to cite it is fatal, is that VBIRT makes clear that the UCC has existed for 50 years and it was recodified as the Texas Business Commerce Code, in particular 2.401B, talks about how when you sell a vehicle as the seller, you deliver the vehicle and receive the consideration. That effectively in itself transfers title. All right. Was the prior owner, I can't remember, isn't it Mr. Bissett maybe, was he listed as the owner of record in the state of Texas records? I mean, was that true or was it not? No, that's not true. That's not true. He was not listed as the owner in the state of Texas. What Mr. Bissett did... Well, let me ask it another way then. Was he still listed as the owner of record, wherever that might have been, New Mexico, Texas, as the owner of the truck when Mr. Trevino is alleged to have signed his name to the title? I agree that he may have been listed as the owner of record in New Mexico. Maybe. No, no. Was he or was he not? I mean, the records are the records. In other words, the wardens apparently reported that. So if I may answer your question, yes, with an explanation. Sure. I would say yes, but VBIRT says that registration only creates a presumption. It's not proof of ownership. But could it support probable cause? No. Could it support probable cause to indict that the prosecutor presents to the grand jury? No. Why not? Because the Texas Certificate of Title Act Section 501.1005, I believe, states that when there's a conflict between the UCC or the Business and Commerce Code 1 through 9, that the Texas Business and Commerce Code preempts application. That sounds like a highly legal proof. You may win at trial on that, but how is that a false or reckless omission from the investigators who present the case to the prosecutor who then puts it to the grand jury? In other words, it may be a full and sufficient answer at trial, but that doesn't sound like Frank's material. Well, we believe it is. It's not necessarily pled in the record, but in the investigative file, Ida never interviewed the first person who sold the car in the stream of commerce. He gave it to his friends, Billy Hines. Billy Hines sold it. It was sold to several people. Now, I realize that you may think that there's a lack of probable cause for that reason, but let me... I don't, really, because that hearsay is admissible to a grand jury. Agents don't have to put first-hand people on. It may be poor investigating because he's going to lose at trial, but in the grand jury, he's going to be a summary agent on a case like this. He's going to always relate what he... right? I hope this is responsive to your inquiry. What they did was selective prosecution, in my view, because they had three holders in due course that were in the same position as Mr. Trevino that were accepting the endorsed title, accepting the vehicle and cash, and then selling it again. All right. Well, if you and I are speeding on a highway, you're following me and I'm going fast or whatever, and the police pull me over, but they don't pull you over, is my citation for speeding, therefore, invalid because they selectively got me and not you? I think your hypothetical is distinguishable because an officer can only act in the moment and doesn't have time to act later. In this case, had they done a thorough investigation, they should have gone after all the people if, in fact, that was the case. And the reason I think it's important is that in this case, they're saying that the... he's essentially saying that the UCC doesn't apply because what each successive holder in due course should have done was register with the county tax assessor collector, and because that didn't happen, that Trevino committed a crime. Well, I think that quite overcomplicates the issue. I mean, what we have, just verify if I've got the record in my mind correctly, you've got these game wardens that are investigating various things. They come across Mr. Russell, Brian Russell, who I thought swore out a statement saying, I think I saw Trevino sign Mr. Bissett's name on the certificate of title for this truck. Isn't that correct? Yes. So they had a statement from this witness, Mr. Russell, who said he signed a different name on the title. But that's not what the statute says. I'm not talking about the statute. Let's talk about what the officers knew, what they had. So they've got this affidavit or statement from Mr. Russell saying he signed not Trevino, but Bissett on the truck, on the truck title, right? And then they go and look up the records on this truck, and Bissett is the owner of the truck, and was an owner, and there were a couple steps of people, and then he's listed as the current owner, correct? I guess what I'm getting at is, is that correct or not correct? I disagree, and this is why. Bissett signed the New Mexico title in blank when he delivered it to Billy Hines. And so whoever was in possession of the truck at the time could have negotiated the truck as bearer paper. So it's clear that when he endorsed the title, he relinquished all claim and authority and ownership to the vehicle. I mean, that's just basic UCC when you endorse an instrument that you no longer have ownership of the instrument or what the instrument represents. This goes back to Judge Higginson's questions. That may win you a trial on the merits of the charge, but I don't know that it negates probable cause when you've got Mr. Trevino signing Mr. Bissett's name and evidence that the wardens know of that Mr. Bissett was the record owner of the truck. Let me rephrase. When the statute says without the legal authority of another, that's the gravamen of the offense. Not that it was a violation of the statute, but what it refers is that the purpose of the Certificate of Title Act is to increase the sale of vehicles in commerce, not to deter. And that's part of the reason why Vibrett ruled against the individual in that case, because they said that the complainant's statute would deter sales of vehicles. And there's no theft of the vehicle here, and that was the purpose of the statute, is to deter theft. And so what I'm telling this Court is that if you grant their view of the case, what you're doing is you're permitting the game wardens to do. The facts as existed would tell any reasonable person that Mr. Trevino was engaged in legal commercial activity per the UCC. Not if he signed somebody else's name to the title. Who was the record owner of the vehicle? Well, I don't disagree with you because Mr. Bissett has no legal authority to complain about ownership of the title or the vehicle. Alright, let's go at this another way. What, regarding the truck, the conveyance of the truck, or the alleged forgery, what was withheld by the wardens from the prosecutor? What facts? Well, one of the things that we pointed out is that the county tax assessor collector to seek rescission of the registration. Why was he required to do that? It's not his title. Well, if he's a peace officer and a document that is falsified and filed with the government, that's tampering with the government record, false entry in a government record. Back to my question. What was withheld by the wardens? Well, one of the things that we alleged, and we believe applies to this case, is that taint, once there's evidence to support the allegation of taint, that in itself is sufficient to defeat the intermediary doctrine. That's what I'm getting at. Right. And so one of the things that we've decided is that Aydin had a habit of doing two interviews of witnesses, one that he wouldn't record, and then a subsequent one that he would record. And Aydin admitted in the trial on the second case that he did that. And what we saw in the second trial was that Aydin would tell... The second trial was a jet ski? Yes. Aydin told the Vietnamese gentleman that the jet ski was stolen, you can't operate it, you can't title it, and in fact the Vietnamese gentleman did exactly that. He titled it, and so he was the owner. And so by lying to the Vietnamese gentleman, he encouraged him to file a criminal charge when the DA, when they realized the true facts in the middle of the trial, dismissed the second count on the Vietnamese gentleman. Third indictment. Where, what facts were withheld by the wardens from the prosecutor? So is there any evidence that he did some sort of nefarious interview of Mr. Russell, Mr. Bissa, anybody related to the truck? And I should say, your allegations were at the Rule 12 stage. We believe that's the case because he admitted that in the second trial. By extension, the third indictment's tainted. Yes, because for lack of a better phrase, it's like 404B, a pattern of behavior of omissions can lead to a reasonable inference that if you did it once, you did it a second time. What's your best case to support that proposition? Well, because what happened with Mr. Nguyen, the Vietnamese gentleman, which is the second indictment, the Texas Business and Commerce Code section 2.401B would apply to that case. And so here we have Mr. Iden a second time ignoring the Texas Business and Commerce Code 2.401B because the title passed when Mr. Nguyen got his consideration, and we know he got his consideration because he was able to register the jet skis trade. So he got his consideration, he got the title, but Iden tried to make that a criminal act. And so he does the same thing again in the case of the third indictment. And that's why we believe that he knowingly disregarded the Texas Business and Commerce Code. And if you knowingly disregard the Texas Business and Commerce Code and you don't disclose that to the prosecution, nowhere in the prosecution guide does it say that the Texas Business and Commerce Code preempts application of the Texas Certificate of Title Act. And that omission in itself should be enough. Your time is just about up, unless you have a final comment or no. Unless you have a question of me. Thank you, Counsel. We'll hear from Buttle. We appreciate it. Thank you. All right. Mr. Hilton. Thank you. Just a few brief points that I'd like to respond to. First, with respect to the alleged habit by Game Warden Iden about doing two interviews and coaching witnesses and whatnot, there is one place in the operative complaint. This is Record on Appeal 1252, and this is paragraphs 131 and 132 of the operative complaint. It refers to an e-mail chain between Iden and a company called Westport Capital. That's an e-mail chain that's connected to the first indictment. And the allegation is that Iden either failed to document these communications or failed to include these communications in his prosecution guides, because that e-mail indicates that there were multiple conversations that were had. And from that, the inference is that, well, Mr. Iden must be coaching witnesses, waiting until that he gets the right answer, and only then does he write it down. That e-mail chain is in the record. It's at 170. And what's very clear from that e-mail chain is Warden Iden was simply just trying to get to the right people and was just trying to get some information. I think he alludes to discussing with apparently some sort of administrative assistant, trying to get the information that he was looking for. There's no suggestion, nothing credibly alleged, no specific facts to suggest that anything was fabricated or falsified or that anything material was ever omitted. So the record and the allegations simply don't support that last point about Warden Iden. I'd also like to note that very sparingly throughout the operative complaint is Game Warden Broccoli mentioned at all. And most of the allegations that we've discussed today and that are discussed in the complaint relate to Warden Iden. So while I think reversal and factual allegations against Game Warden Broccoli, that could support any of these claims. Of course, we argue that with respect to both, but especially true with respect to Broccoli. With respect to this point of... The simplest way to handle this from your standpoint would be to say that the Game Wardens violated clearly established law? Absolutely, Your Honor. That is a way to avoid all these somewhat trickier questions that involve a more detailed analysis of the record. We've got very clearly from Mr. Trevino that this Vibber case is what he's relying on as the clearly established law. I think the argument fundamentally doesn't appreciate the offense with which he was charged. That's Texas Transportation Code 501.155. And that offense is essentially if you sign a list of certain specified vehicle title documents without legal authority in the name of another person. And so the question of when did actual ownership transfer, who owned it and when, it's simply irrelevant to that offense. You say absolutely that's an independent ground. I think the specific question was is Texas urging that as its primary ground. It isn't a ground that the lower courts reach, number one. And number two, it's quite intricate as to Texas laws. So are you saying it's absolutely an independent ground or are you saying your argument to us is that's the easier ground? It is an independent ground. Our primary argument is the independent intermediary doctrine. But this is absolutely an alternative that's available to the Court in its discretion. And I think regardless of what I think my primary argument is, it's quite frankly up to you three. So again, actual ownership, completely irrelevant to the offense that was charged. The last point that I want to respond to was with respect to this motion to increase bond. Our view is that that relates to activity related to the second indictment. That's the one for which Mr. Trevino was tried and found guilty and reversed on appeal. So our view is that's simply out of the case at this point. To the extent that it does merit a response, again, the prosecutors did seek to increase the bond, not my clients. But one of the internal affairs reports addresses this situation about the no contact aspect of that. There was some allegation that perhaps Mr. Trevino was following Ward 9 and they just kept happening to run into each other. He parked very close to his car in a Walmart. And there's some detailed allegations that kind of give the back story regarding that. Again, our view is that it's completely irrelevant to what's actually before the Court. But those two reports are at 485 and 848 in the record. And I see that I'm out of time. Thank you very much.